At this term the following opinions were'delivered, and the ease decided:
Rossell, J. —
In investigating this subject, it will be necessary to take into view the circumstances under which the several laws respecting the Indians lands, were passed. In 1758, the governor and general assembly of the then colony of New Jersey, at the request of the Indian natives, south of the Earitan, passed a law, empowering certain commissioners therein named, to purchase a tract of land, in the county of Burlington; this was' done, and agreeably to the directions of that act, the deed was made to those commis.sioners and their heirs in trust, for the use of the said Indians and their successors forever; and by a special provision, the Indians were prohibited from leasing or selling and part of them lands, which by the 7th section of said law, were thereafter to he exempt from taxation.
*287 In 1801 the remnant of Indians living on this tract addressed the Legislature of this State, declaring that better prospects opened to them elsewhere, and they were [*] therefore desirous that their lands should be sold for their benefit.
The Legislature granted their request; but as the terms by which their lands were held were only made necessary from the peculiarities ever attendant on the savage state, the law of 1801, annulling the original contract, empowered commissioners not only to sell the use and oeeupancy, but to convey an absolute fee simple to the purchasers. The lands were sold under this law; and the true question appears to be whether the exemption from taxation was conveyed and goes with the land, or whether, as merely adapted to the peculiar’ situation and circumstances of the aborigines of the soil, it attached to them only, and ceased with their possession.
The Legislature, in 1758, without doubt well acquainted wdtli the ignorance and consequent poverty and wants of the Indians, carefully and wisely provided that their lands should neither be leased or sold, thus securing them, as far as they had the power of controlling future events, to the Indians forever, that, in the words of the act, “ they might have always in view a lasting monument of the justice and tenderness of the government towards them.” But this [222] salutary provision would have become nugatory in a few years, the Indians turned out of possession, and the humane intentions of the Legislature frustrated, through the improvident and incurable carelessness of these people, had their lands been liable to be seized for taxes. The 7th section was therefore passed, declaring that thereafter they should be exempt therefrom. The land itself was purchased with the money of the Indians, it is true, but the 7th section emanated from the justice and generosity of the Legislature *288 as a voluntary donation, necessary from the well-known state of Indian society, if the government meant (as it appears they really did mean) to act towards these people with good faith. It is easy to perceive, on examining the law, that this exemption was never in legislative contemplation distinct from Indian possession; the former, was predicated on the [*] latter; they went together, and both by that laAV were to continue forever.
It is strongly contended, by the counsel for the present owners, “that they purchased all the Indians’ right, and stand precisely on the ground they stood on.” But would they be content to stand on the same ground, that is, to have the use and occupancy of the soil only? They certainly would not. They reject the 1st section of the law of 1758, limiting the Indian title to possession; and claim an absolute fee-simple in the lands, under that of 1801 — but not finding in the latter the privilege they wish, they return to the law of 1758, and claim this privilege under the 7th section of that law, and say the Legislature had no power to repeal it. But it has been justly observed by the counsel for the defendant in this case, “ that if the Legislature had no power to repeal the seventh section, they had none to repeal the first, providing for the successors of the present race of Indians.” This, in my mind, is conclusive.
The contract under consideration may be divided into two parts: the first, providing a dwelling place not only for the Indians south of The Raritan then in being, but for their successors forever; secondly, that this home so provided, should be free from all taxes. These stand or fall by the same authority. Either our Legislature had the power to annul these provisions, or they had not; if they did not p'ossess this power, the law of 1758 stands unrepealed, and the title under which the present possessors hold their land, is totally void; and the one-fourth part of the Indians late residing on the lands, (whose voice the law declared was not *289 to be regarded in their disposal, if any such there were,) as well as the successors of those who did or did not consent to the s;de, have the only just and legal claim. And the declaration of the real plaintiffs, if [223] correct, would go to the destruction of that foundation on which they build their claim.
[*] If the Legislature had this power, they had also the right to declare the terms on which they would exercise it. This they did do, as I conceive, by the law authorizing the sale. They do not formally declare “ we repeal the law of 1758,” yet it was actually repealed, by the power given to the commissioners to sell. The purchasers do not then hold under the Indians, but under the State; and we must look to the law of 1801, for their title. On examining this law, we find no continuance of this unusual exemption from taxation; and the long established rule in the construction of statutes as well applied here by the legislature, that the reason of the immunity having ceased, the law creating it also ceased, and the purchasers should take no other title in their lands, but what they derived from the law of 1801. Neither has it been shown, that the legislature or their agents, held up this exemption to enhance the value of the lands; or that any were induced from that consideration to become purchasers; and as they hold their lands on much better terms than the Indians held them, as they have all the right guaranteed by the law of 1801, I see no just reason of complaint; and if they have mistaken the law they only are to abide the consequences.
A constitutional question has been also raised. But it is seen from the brief view I have taken of this subject, that I do not consider that part of the constitution of the United States, respecting the inviolability of contracts, as touching this question; or if it does, that it would bear most hardly on the present possessors.
A former decision of the supreme court has likewise been *290 produced. The reasons that governed the court, I am entirely unacquainted with; and although I am ever desirous that the most perfect uniformity should prevail in our decisions, yet as now called to exercise my judgment on the arguments and facts before us, I do not consider myself as bound by the one shown.
[*] On the whole, I am of opinion, that the assessment be affirmed.
Pennington, J.
— We are called upon by' the counsel for the prosecutors to say, that the act of our Assembly, of the 1st of December, 1801, repealing the 7th section of the act of the colonial government, exempting certain lands therein provided for and allotted to certain native Indians, from being subject to any tax, is a law impairing the obligation of contracts, and, therefore, [224] by the constitution of the government of the United States, void. The first inquiry is, does this law impair the obligation of any contract, as coming within the meaning of the constitution of the United States ? The Indians make no complaint; they have the value of the land, and are satisfied. The possessors of the land complain; and the question is, did there exist a'contract between them and the State, that their lands should forever be exempt from tax. A contract like this contended for, which is to bind future legislatures to the end of time, from raising the necessary taxes for the support of the government, and the exigencies of the country, on a considerable district of the territory of the State, ought at least to be clear and explicit, free from all doubt and uncertainty, not depending on implication and construction, growing out of former provisions on subjects of policy under the colonial government. When we look into the law authorizing the commissioners to sell the land, we find no authority there authorizing them to stipulate its exemption from taxes; the authority is to sell the land at public sale, and to execute sufficient deeds and assurances for it to the purchasers; the *291 most that can be implied, from the authority given the commissioners is, that they were to sell and assure to the purchasers, the land in fee-simple. I will not look into the deeds of conveyance from the commissioners to the purchasers ; if they have exceeded the authority given them, their unauthorized acts will not bind the State. The fee of the land was not in the Indians. The purchasers cannot [*] claim title from or under them. The commissioners were not authorized to sell the interests or rights of the Indians, but to sell the land. The fee of this land was in certain trustees, who were the agents of the State. The fact is, the land was in the custody of the State, for the benefit of the Indians; and at their request, the State ordered it sold, and appropriated the purchase money for their advantage and benefit. But it is said that these lands were exempt from tax at the time of the sale: be it so — was the State under the obligation of contract to continue the exemption? I think not. So far as the question respects the purchasers, 1 consider it a question of policy — not of right. What is this transaction with the Indians, which it is said runs with the'land, and is to continue to the end of time ? The colonial government, in the year 1758, finding a considerable number of native Indians scattered in various parts of the State, who set up claims to various portions of uncultivated lands, thought proper, instead of investigating their various claims, to appoint commissioners to treat with them, and to extinguish their claims by purchase, for a certain sum of money; and the Indians expressing [225] a desire to have part of this money laid out in land for their use, the law authorized the commissioners to comply with their desire, by purchasing in the name of the governor and the commissioners, a convenient tract or tracts of land, for the use of the Indians and their successors forever; no doubt meaning thereby their descendants. And in order to render this purchase permanently useful to this unfortunate race of men, the Legisla *292 ture of the colony enact certain useful regulations: First, that it shall not be in the power of the Indians at any time, to sell or lease any part of the land. Second, that if any person or persons, Indians excepted, shall attempt to settle on the land, that it should be lawful for any justice of the peace to issue his 'warrant, to remove such person or persons from such land. Third, all persons except Indians, were enjoined, under severe penalty, [*] from cutting or carting off of such land, any cedar, pine, or oak trees. Fourth, that that the lands so purchased should not hereafter be subject to amy tax. This tribe of Indians lived on the land so purchased for them, until the year 1801, when they applied to the Legislature for permission to dispose of their interest in the land; on which the Legislature, considering the fee of the land in the State, passed a law authorizing certain commissioners to sell the land, and to appropriate the purchase money to the use of the Indians, and also to move them out of the State at their desire. It appears to me, that the whole of the provisions and regulations in the act of 1758, is done away by the act of 1801, and the sales under it. That the land is unlocked and let loose from those restrictions and provisions, and put on a footing with all other land of the State; that the exemption from taxation cannot reasonably be considered as having a longer duration than the estate to which it was appurtenant; a much stronger word of perpetuity was made use of in creating the estate, than in establishing the exemption. That they gave their consent is nothing; for all the provisions in the act of 1758, are bottomed on the idea, that they were incapable of judging of their own interest. They could neither sell nor lease the land. If the Legislature had the right to sell the land, it had also, as incident to that, a power to take off the other provisions and restrictions connected with it. I am of opinion, that the repealing law of 1801, is not only constitutional, but wise and proper. The exemption from taxation while *293 the land was in the possession, use, and occupation of the Indians, who were from their habits incapable of paying taxes, was benevolent and prudent; but to carry this exemption to the citizens of a commonwealth, would be unequal, [226] odious, and unjust. To say, that the purchasers paid more for the land than they otherwise would have done, under an expectation that they were to be perpetually exempt from a land tax, is paying no compliment to the understandings of the enlightened yeomanry of Burlington county. If, [*] however, they entertained such a mistaken notion, it is time they were put right. The policy of the law, however, is not under consideration, but its constitutionality. For the reasons which I have expressed, I cannot conceive that any obligation of contract hath been impaired by it; and am of opinion, that the prosecutors take nothing by their writ.
1 very much doubt the regularity of the proceedings, by which this matter is brought before this court; but as no exception is taken to them, and as I am of opinion against the certiorari on the merits, I shall waive giving any opinion on this point.
Kirkpatrick, C.
J. — Let judgment of non-pros be entered.[1]
Cited in State v. Mor. Can. & Bkg. Gr , 2 Gr. 411; State v. Falkinburg, 3 Gr. 320.
Reversed State v. Wilson, 7 Cranch. 164

 Reversed on writ of error, in Supreme Court of United States. — 7 Cranch. 164.